Next case on the calendar, Feng v. Sessions. Good morning, Your Honours. Good morning. If it pleases the Court, I'm here to argue the case of Mr. Feng and how the— Is it Feng, not Lin? Yes, it is. Lin— Which is his last name? It's Lin, Your Honour. I apologize to the Court. How the BIA, which is the Board of Immigration Appeals, erred in this case in denying the appellant's asylum applications and all other relief that he applied for. Now, the BIA decision closely tracked the immigration judge's decision in this case. I was the attorney in that case. And in that case, the appellant applied for asylum. Now, at the hearing, in the BIA's decision, it asserts that the respondent did not meet his burden. How he did not meet his burden was that he was not credible. And how the court arrived at that decision and how the BIA agreed with the immigration judge was that the BIA gave its own analysis of the judge's decision. Now— As I understand it, the determination of the Board also was that your client failed to carry his burden on his own testimony. That's correct, Your Honour. And also failed to present corroborating evidence. Could you address the corroborating evidence part? Yes. Now, the corroborating evidence—this arose in the context of providing a letter from—he's a Christian, and he's alleging that he was persecuted in China based on his religious belief. The immigration judge then says at the hearing, like, oh, what is your religious practice here in the United States? And he said, well, I haven't gone to church in quite a while. The judge says, well, what happened? Well, unfortunately, I didn't get a work permit, so in order to sustain myself, I've not had the opportunity to go to church because I stand on a street corner in Chinatown and I look for work. All the employers are not willing to employ me because I don't have a work permit. I understood, though, that Lynn testified that the—Lynn testified that the church did not refuse to provide documentation, but merely that it needed more than a four days' notice. Is that correct? That's correct. And this is in the same context because if he had gone to church, he would have had the letter prior to that dating question. So finally, when he does make amends and does start to attend church, it's then the church says, well, I will give you the letter. So in that context, he explains to the judge and says, well, this is what the church said. They will not give me the letter. And even when they're willing to give me a letter— They needed four days' notice. They needed four days in which to give it. So it wasn't that they wouldn't give a letter, it's just that they needed four days' notice. That's correct. And the judge said, well, I'm not—since you've had all this time to prepare for this case, I'm not going to give you that additional time in which to provide that letter. He didn't associate himself with the Christian community in this country, correct? I beg your pardon, Your Honor? He didn't attend services. Yes, he did attend services on a regular basis. On an irregular basis? He attended on an irregular basis. And this was because he didn't have a means of livelihood and he had to basically stand on a corner and solicit for work in order to support himself. Was the IJ entirely wrong in thinking that his commitment to Christianity was not all that deep? Well, the judge has every right to say that. The judge has every right to say that. But an individual's choices, life choices, cannot be the basis for making an adverse credibility finding. He made bad choices, sir. He didn't attend church. Well, he says I'm a Christian. He didn't attend church. But he gave a plausible reason why he didn't attend church. So I didn't go to church. Your argument, as I understand it, is that religiosity is not necessarily wholly a function of church attendance. That's correct, Your Honor. If the judge really was intent on determining how he practices religion, the judge could have asked him, do you pray at home? The judge could have developed the record, do you pray at home? Do you go to fellowship with others? Going to church is not necessarily a reflection of, well, being religious, Your Honor. But he had been asked those questions on cross-examination? On cross-examination, no. He could not have been asked? Could he have been asked? Yes, he could have been, yes. But he was not. But he was not. He was not. It was the judge that asked him the questions. I didn't ask him those questions, and neither did the DHS. In Lynn's application, the application states, quote, police officers broke into the house with batons, and we were all taken to the local police station. But at the hearing, the testimony was that some of the churchgoers escaped, and only three were arrested. Your brief quotes the application, but doesn't reconcile these statements. Yes. Now, at page 176 of the record, which is what you quoted from, Your Honor, he says, now, we were having our normal prayer and sharing church members' stories, and then going down further, he said, we were all taken. Now, when these things are written, they don't lend themselves to completeness. The court has already — the second circuit has already decided that at all times, these things in Pavlova, these things don't lend themselves to completeness. In this situation here, it was when we got to the testimony that this record was developed, and then he explained that there were eight people. I asked him. I said, how many people were there? He said, there were eight. And I said, did anybody escape? And he said, no. He said — I'll take that back. He said, yes, that I was standing near the door, and some people managed to flee, and those of us that were left were taken away by the police. And that was his testimony. And that taken as a whole, it doesn't diminish from his statement here, Your Honor. It does not in any way. Now, you've got a section of your brief on the convention against torture point. But the BIA's order notes that this decision was not challenged before the board, and the BIA deemed it waived. Accordingly, haven't you waived that challenge in this court? No, Your Honor. But the reason why is because the same standards that apply to asylum also apply to the convention against torture and withholding of removal. So if the respondent has found credible, then he would have satisfied that burden. He would have overcome that burden. He would have satisfied his burden for withholding of removal and protection under the convention against torture. My time is up, Your Honor. Thank you. Good morning, Your Honors. May it please the court, Neha Kamani for the Attorney General. The court should deny Mr. Lynn's petition for review because he has not shown that the record compels a contrary conclusion from the board's determination that he failed to present a credible claim for asylum and withholding of removal. The board and immigration judge cited several factors in making the adverse credibility determination, including a lack of details in describing his alleged persecution, inconsistencies between his credible fear interview, the asylum statement, and his hearing testimony regarding the severity of the treatment he allegedly endured, a lack of interest in practicing his religion in the United States, which casts doubt on whether he's a practicing Christian, inaccurate background information in his application, and a lack of reasonably available corroboration. Let's go, if we could, to the argument that the reliance on the credible fear interview was improper under the four-factor test of this court in Ramachari. So in this case, right, there's no transcript of the interview, but merely the notes that the IJ characterized as sketchy. Moreover, let me just finish, and you'll have all the time you need. The immigration officer didn't probe the details relied upon by the IJ, such as the number of people arrested in the police raid. And Lin alleges that he was previously beaten in the hands of Chinese authorities. Why aren't these three factors enough to undermine the reliability of the credibility fear interview? Well, if we look at the credible fear interview, which is at the end of the record on pages 204, or sorry, 203 all the way till 215, we'll see that Mr. Lin was represented by counsel during the credible fear interview. It was, an interpreter was present, and therefore it was in his native language. At no point did he indicate that he didn't understand the questions being posed to him or the significance of this interview. The interview, while the asylum officer made notes on page 207, there is a verbatim transcript of the questions and responses given during the interview, and you can see that on pages 209 to 215. The immigration judge's issue with the credible fear interview and also with Mr. Lin's testimony during the hearing, removal hearing, was his lack of detail. He didn't seem to want to divulge any additional details. He provided curt responses, and this is apparent during his hearing testimony before the immigration judge. On direct examination, his attorney asked him, can you describe the 10 days you were allegedly detained? Mr. Lin responded, I was locked in a dark room. His attorney didn't press any further. On cross-examination, government's counsel pressed further and asked, what happened? What happened during these 10 days you were detained? Mr. Lin responded, and if you'd like to see, this is on page 112 of the record. Mr. Lin responded, I sat and prayed. The government's counsel asked him again, well, can you describe to us what happened during those 10 days? Can you describe a typical day for us from morning till night? There was simply a long pause. Mr. Lin paused for a long time. The immigration judge noted that pause. And after that, Mr. Lin did not provide any further details as to what happened during those 10 days of detainment. In his brief before the board, he didn't address this lack of detail, his inability to explain what happened during those 10 days. In his brief before this court, he does not explain his inability to describe those 10 days. The IJA relied on omissions, right? Like the fact that when Lin was detained by Chinese authorities, he was beaten, handcuffed and then beaten further, and had his mouth not only swelled but also bled. I mean, aren't these really just very minor factual variations? The inconsistency changed throughout. So initially before the asylum officer during the credible fear interview, he said that I was slapped and my mouth or my face swelled up. In his asylum statement, he said slapped and that his face was bleeding. In his hearing testimony before the immigration judge, he stated that he was slapped, handcuffed and beaten. And the problem with these inconsistencies or the severity of his treatment increasing... How are they really inconsistent? The severity is increasing from the time of the credible fear interview to the asylum application to his hearing testimony. Being handcuffed and beaten is significantly different from simply having his face slapped. And without having a clear and consistent idea of what happened to Mr. Lin during his interrogation, the immigration judge cannot determine whether or not his experiences rose to the level of persecution. It's pretty much the same story, doesn't it? Isn't it the same story he told with minor detailed changes? The severity changed. And one cannot determine whether one has been persecuted without a consistent description of what has happened. But this was just one, one of the discrepancies that the immigration judge and the board relied upon. There were so many other factors that went into this adverse credibility determination. And as I stated before, there was a lack of detail in him describing his detainment. There was a lack of interest in him practicing his religion here in the United States. There was inaccurate background information in his asylum application regarding his employment in China as well as his address here in the United States. And all of this was coupled with a lack of reasonably available corroboration. He didn't provide corroboration from anyone in China, his parents, his pastors, other churches. Is it doubt that his family had to pay 5,000 RMBs to get him out of jail? There's only his testimony on that. There is no corroboration on that aspect of his claim. He didn't provide any corroboration from the church. How did you get corroboration of that? Do you think they give a receipt? He could have either provided a receipt if there was one. He could have gotten a letter from his parents stating the circumstances of his release. None of that was presented. Let me ask you if I could about, and you've mentioned it, church attendance. Yes. It would be one thing if he had said, oh, I attend the church all the time, and that turned out not to be true. But he says that he attended church infrequently. And the IJ seems to believe that the IJ can make a determination as to how much church attendance makes one a Christian. Aren't you uncomfortable with that? Let me put it in a different way. Is the test of whether someone is a Christian, is that test how much one attends church? The immigration judge nor the board was stating that. In fact, if we look at page 49 of the immigration judge's decision, he states that the absence of church attendance along with the absence of any explanation that the respondent has taken part in Christian activities outside an organized church, which is possible, would be inconsistent with the idea that he's a practicing Christian. Why can't you practice your religion at home? Right, exactly. No, no, no. I mean in terms of formal practice or anything else. I mean how somebody chooses to exercise his or her First Amendment rights with respect to religious observation is not something that we typically delve into. Yes, and the immigration judge did not ask him about his doctrinal knowledge. He was just looking to see his interest in practicing his religion. And it didn't, as the sentence shows from the immigration judge's decision, and there's a similar sentence in the board's decision, they weren't looking simply at church attendance. They were looking to see whether he was practicing his religion in any other way. How would that be shown? Practicing at home, reading the Bible, getting together with other members of the church during a time that might be convenient for him if the services weren't at a time that he could attend. But none of that was shown either in his hearing testimony, his appeal brief. That simply was not shown. And given that his whole claim centered on the fact that— What if I were to say I am a Christian, I believe in the tenets of Christianity, how I practice Christianity is none of your business? But his claim isn't simply that the Chinese authorities were after him for practicing his religion. They were after him according to his own testimony because he attended this underground church, which they believed to be some sort of underground cult that was plotting against the government. And so they were interested in his attendance at this underground church. Now, if he has no interest in attending a church, whether it be here in the United States or an underground church in China, then he has no basis for fear of removal because the Chinese authorities were not interested in whether he was practicing Christianity. They were interested in whether he was going to this underground church according to his own testimony. So if somebody, let's say, leaves a country because he or she was a practicing Christian or practicing whatever religion that is viewed with disfavor by that country, comes to this country, decides on reflection I am no longer a Christian, then that's a basis for removal. Is that your view? It would undermine their fear of removal. Because they can go back to their country without, since they've renounced their religion. Is that your... If their basis for their fear is that they cannot practice their religion without being persecuted, and if they're no longer practicing their religion, then they don't have a basis for a fear of future persecution. In all, the totality of the circumstances here show that the board and immigration judge were correct in making their adverse credibility determination. There are multiple factors that support this, including the lack of detail in his testimony, the inconsistencies, the lack of corroboration, and the lack of persuasive explanations. If your honors don't have any further questions, respondent urges the court to deny this petition for review. Thank you. Thank you. Thank you, your honors. Now the government reasserts its arguments that it's given previously, the government argues on behalf of the BIA, and I'm going back to that. The government states that one of the major inconsistencies was his testimony with regards to his beating while he was in custody. Now, the government keeps saying that his testimony escalates in seriousness, but in actual fact, there really isn't much difference. If you take a comparison and look at the page 213 of the record on page 176, at 176 he says, the police officer did not let me finish my words and slapped me harshly until my mouth was bleeding. In the credible fear statement, he says, they slapped my face several times and swelled up. Now, if we look at the credible fear, it basically was only, looking at it from its brevity, it was only meant to, well, let's quickly do this and does he qualify for asylum so we can, you know, leave him in detention so he can go to an immigration judge. It never really went to, why are you really applying for asylum? Tell me your real story. Tell me the full story. This doesn't really satisfy the Ramers' shared test in that regard. So this really can't be used as the basis for an adverse credibility in itself. I don't see where there's anything in this record that support, in totality. The government says, well, he was wearing handcuffs. Well, if, let's say I was outside and the police officer arrests me, he will put me in handcuffs. The judge developed the record to say, were you ever handcuffed when you were detained? Were you handcuffed at the police station? But then the judge says, well, he says I was handcuffed. He's in a police station. The judge didn't ask from the very beginning, didn't develop the record and say, well, were you handcuffed when you were taken in? Were you handcuffed as you were taken to the police station? The judge didn't ask, were you handcuffed while you were in the police station? But the judge says, he mentions being handcuffed because this is now a full hearing and we're three hours into this hearing and all sorts of things come out. He must have written, the credible fear interview must have been half an hour. And to tell you the truth, he didn't have an attorney present. Taking the record as a whole. You're saying at the credible interview stage there was not an attorney present? In my opinion, I don't think there was an attorney present. It was between the asylum officer and the appellant. To summarize, Your Honors, the respondent has carried his burden. He has shown that he suffered persecution in China. Through his testimony, through his documentary evidence, he has shown that he was ill-treated by the police. And this was based on his religious beliefs. Whether he practices religion the way we want him to practice it here, whether he wears his religion on his sleeve, that's his right to do. But just because he doesn't do that doesn't mean he has no fear of going back to China based on his religion. And it's my belief that the respondent has carried his burden. And the court should remand this back to the BIA for further testimony. Thank you. Thank you both for your arguments. The court will reserve decision.